NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CHAOYING GENG, | : | |
| | : | |
| Plaintiff, | : | Civil No. 13-0004 (JAP) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| PNC FINANCIAL SERVICES | : | |
| GROUP, INC., d/b/a PNC BANK | : | |
| and ERICH FULLER, | : | |
| | : | |
| Defendants. | : | |
| | : | |

PISANO, District Judge.

Plaintiff Chaoying Geng ("Geng" or "Plaintiff") brings this lawsuit against Defendants PNC

Financial Services Group ("PNC") and Erich Fuller ("Fuller").  Plaintiff alleges that she was

subjected to discrimination based upon her age and race/national origin and eventually terminated in

retaliation for complaining about the alleged discrimination, in violation of 42 U.S.C. § 1981 and

the New Jersey Law Against Disabilities ("NJLAD"), N.J. Stat. Ann. §§ 10:5-1 *et seq*.  Plaintiff

also claims that Defendants interfered with her rights and retaliated against her for taking medical

leave in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq*.

Before the Court is Defendants' motion for summary judgment [ECF No. 26].  Plaintiff opposes this

motion.  The Court decides these matters without oral argument pursuant to Federal Rule of Civil

Procedure 78. For the reasons set forth below, the Court grants Defendants' motion.

## I.      Background

A.      *Geng's Employment with PNC*

Ms. Geng is a fifty-three year-old woman, who was born in China and moved to the United

States in 1994, becoming a citizen in 2001.  Plaintiff started working at PNC's predecessor in

February 2004, at its East Windsor, New Jersey branch, as a Senior Teller.  In December 2006, she was transferred to the Skillman, New Jersey branch.  In 2007, Plaintiff was promoted to the position of Head Teller.  In March 2008, Plaintiff's position was renamed "Teller Bank Supervisor."  Plaintiff remained in this position for about five years, until February 2012.  In or around February 2012, Plaintiff began working at the Ringoes, New Jersey branch office until it closed in June 2012.  Thereafter, Plaintiff became a "floater" or a floating Teller and worked at different branches based on need.  Her salary and title did not change.

      B.    *Geng's Transfer to Lambertville and Subsequent Performance Issues*

On or about August 7, 2012, Plaintiff transferred to the Lambertville Branch, where she maintained her position as a Teller Bank Supervisor.  Plaintiff supervised two Tellers, Crystal Rice ("Rice"), who is African-American, and Jonathon Reese ("Reese"), who is Caucasian.  At the Lambertville Branch, Plaintiff reported to Defendant Fuller, the Branch Manager.  Fuller, in turn, reported to Carole Bursac ("Bursac"), the Regional Manager.  After her transfer to the Lambertville Branch, Plaintiff continued to assist at other branches as needed.  Bursac also assigned Plaintiff to train with another Teller Supervisor from the Sergeantsville, New Jersey branch office for a brief period to help her develop her supervisory skills.

On or about August 15, 2012, Bursac issued Plaintiff's mid-year performance evaluation for her performance before transferring to Lambertville.  Bursac rated Plaintiff's overall performance as "Trending Towards Meets Some [Expectations]" and indicated that Geng needed to develop her coaching and development skills with the tellers who reported to her, as well as focus on managing risk.  The evaluation also indicated that Plaintiff was a "5 star performer" in the area of client interactions.  Plaintiff had generally received positive reviews, although the evaluations did note that Plaintiff had room to show improvement; for example, the evaluations indicated that Plaintiff

needed to recognize the authority of her supervisors, accept constructive criticism, and learn to properly identify counterfeit money and potentially fraudulent activity.[1]

On August 25, 2012, Plaintiff asked Rice, who had already balanced and settled her teller drawer for the day, to exchange approximately $200 in cash for a customer.  Rice told Plaintiff that she could not exchange any money because her cash drawer balance needed to match the amount she logged in the system.   Plaintiff instructed Rice to do so, because the branch was still open, which Rice did.  While Plaintiff has testified that she told Rice to resettle her drawer after she exchanged the money, Rice stated that Geng instructed her to exchange the money without re-balancing her cash drawer or completing a buy-sell ticket.

Rice eventually reported this incident to Fuller and told him that she thought this was a violation of PNC's "Cash Balancing" and "Buying or Selling Cash" policies.  PNC's "Buying or Selling Cash" policy provides that, in the course of a shift, tellers may need to "buy" or "sell" cash to and from one another to meet their cash drawer.  If a buy/sell is in excess of $100, it must be recorded at the time the cash is exchanged.   PNC policy also provides that once a teller has balanced and settled his or her drawer for the day, the teller cannot process additional transactions or buy/sell cash.   A teller must also ensure that the cash in his or her drawer equals the amount reflected on the bank's computer system at the end of the day.   As Teller Supervisor, Plaintiff was responsible for following and enforcing PNC's policies.

Fuller suspected that Plaintiff's conduct violated PNC's Code of Business Conduct and Ethics (the "Code of Ethics"), a code which sets forth PNC's expectations for its employees and

---

[1] In her 2011 evaluation (the most recent evaluation before Plaintiff was terminated), Plaintiff's then-manager complimented Plaintiff's work performance in many respects, noting that she had an excellent year as a teller, that she was a "team player," and that she was capable of handling the daily operations of the Skillman branch, where Plaintiff was working at the time.  The evaluation, however, specifically noted that Plaintiff had "some shortcomings to address" and that, "[a]s an experienced teller supervisor, it was disappointing that [Plaintiff] did not answer most of the questions [on the branch's BAT test] correctly."  Pl.'s Counter-Statement Ex. I at PNC 93.  All of the questions that Plaintiff failed to answer correctly had to do with PNC's policies and procedures.  *Id.*

requires employees to report possible violations.   Accordingly, on August 31, 2012, Fuller called

the Employee Relations Information Center ("ERIC") and reported his concerns about the incident.

Fuller did not discuss the incident with Plaintiff before calling ERIC, apparently because Plaintiff

was out of the office until September 5, 2012.  Senior Employee Relations Specialist Micheline

Fornarotto ("Fornarotto") reviewed and investigated the matter.  While Fornarotto determined that

Plaintiff's conduct did not violate the Code of Ethics, Fornarotto concluded that Plaintiff had

violated PNC's Buying or Selling Cash policy and recommended that Plaintiff be given a written

warning (the "August 25 Warning").[2]   A written warning was determined to be appropriate

"because [Plaintiff was] the teller supervisor and in a position of authority she shouldn't be telling

subordinates to break policy and procedure.  In addition, she did this in front of customers and

[Rice] felt embarrassed."  Pl.'s Counter-Statement Ex. O at PNC 532.

On September 20, 2012, Fuller and Ed Holt, another Teller Supervisor and Plaintiff's

trainer, asked Geng to consider whether she really wanted to be a Teller Supervisor instead of a

Teller.  According to Geng, Holt asked her if she wanted to step down, and Fuller then supported

him, telling Geng that being a Teller Supervisor is stressful and that Geng was a "perfect teller."

*See* Deposition of Chaoying Geng ("Geng Dep.") 198–99.  According to the record, Fuller never

asked Geng to step down as a Teller Supervisor.

On or about September 24, 2012, a customer and owner of a nearby restaurant came into the

Lambertville Branch and told Plaintiff that Reese purchased food at his restaurant but that the

payment may not have gone through.  Plaintiff then looked at Reese's personal banking account

because she thought she could determine if any charges appeared.  Reese reported that Plaintiff's

---

[2] This was not the first written warning Plaintiff had received as an employee at PNC.  In 2010, Plaintiff had received two written warnings.  In April 2010, Geng's Branch Manager issued her a written warning for leaving a box full of negotiable instruments, as well as the vault room door and the drawers behind the teller line, unlocked.  The warning also cited Geng for poor customer service and check-cashing violations in regards to a non-customer.  In September 2010, the same Branch Manager issued Geng another written warning for a policy/procedure violation.  Plaintiff admittedly failed to follow proper guidelines for depositing a government check.

violation of his privacy upset him because he did not authorize her to look at his account.  Plaintiff reported to Fuller that she had looked at Reese's personal bank account while trying to assist the restaurant owner who was looking for information.  After receiving this report, Fuller called the ERIC hotline and reported the incident because he believed it was a violation of the Code of Ethics.  Under the Code of Ethics, employees are required to respect and safeguard confidential information about others, including colleagues, and to never disclose such confidential information to anyone who is not entitled to receive it.  Senior Employee Relations Investigator Linda Brodsky ("Brodsky") investigated the matter.  As part of her investigation, she interviewed Fuller, Reese, and Geng.  Brodsky eventually concluded that Geng's conduct violated PNC's Code of Ethics.  Geng admits that her conduct violated the Code of Ethics.  After consulting with Fuller and Bursac, Brodsky recommended that Plaintiff be given a Final Written Warning, consistent with past practice (the "September 24 Written Warning").

On September 25, 2012, a female Chinese Restaurant owner came into the branch to close the restaurant's account.   The customer decided to close the account despite the large fee that she would incur.  When Geng told Fuller this, Fuller responded that the woman was "dumb" and "stupid."  Geng Dep. 203–04.

On September 27, 2012, Fuller and Bursac had a meeting with Plaintiff.  During this meeting, Fuller and Bursac advised Plaintiff of several concerns they had with her performance, including the incident in which Plaintiff viewed Reese's personal bank account.  Bursac also issued Geng a verbal warning for walking away from her teller station without locking her drawers, which Bursac had observed earlier that day, because it is a violation of PNC's policy and procedure regarding locking a teller's drawers.  Bursac and Fuller both testified that they delivered the August 25 Warning to Plaintiff at this meeting, but Geng stated at her deposition that she did not recall ever

seeing this written warning.  The August 25 Warning has Fuller's signature and indicates that Geng refused to sign the warning.

On September 28, 2012, Brodsky advised Geng that she would receive a Final Written Warning for her violation of the Code of Ethics on September 24, 2012.[3]  After being told this, Plaintiff complained to Brodsky that she felt discriminated by Fuller because of her race and age. On September 30, 2012, Plaintiff attempted to email the Regional Manager, Jim Kim.  Instead, Plaintiff emailed a "Jim King," an apparent typo which resulted in no one at PNC ever receiving the email.  In the email, Plaintiff states:  "I am contacting you to report the Lambertville Branch Manager, Erich Fuller, for creating a hostile work environment due to discrimination."  Pl.'s Counter-Statement Ex. V.

Following the September 27 meeting, Plaintiff claimed that she became distraught and unable to sleep.  Therefore, Geng initiated a short-term disability leave on Monday, October 1, 2012.

C.      *Geng's Check-Cashing Violations*

Also on September 28, 2012, Fuller learned from Customer Service Associate Carolina Seamon ("Seamon") that Geng had been processing checks in violation of PNC procedures, as well as cashing checks in violation of PNC policy, through September 2012.  After Seamon brought the check cashing violation to Fuller's attention, Fuller did research to find others, because he wanted to find out if there were more incidences like the reported one as he did not "want to report to her half a problem and deal with half a problem now, half a problem later."  Deposition of Erich Fuller ("Fuller Dep.") at 37.  After further investigation, Fuller discovered that Geng had potentially committed eleven separate check-cashing violations.  Fuller contacted ERIC for guidance on the same day, and Senior Employee Relations Specialist Fornarotto was assigned to address the issues.

---

[3] This September 24 Written Warning was prepared by Brodsky, but not delivered by Fuller to Geng until November 8, 2012, approximately two weeks after Geng returned from a three-week medical leave of absence.

On September 29, 2012, Fornarotto and Fuller made plans to talk on October 1, 2012.  Fornarotto and Fuller talked briefly on October 1, at which point Fuller informed Fornarotto that Geng was out on short-term disability and was not expected to return to work for a few weeks.

      D.     *Geng's Medical Leave of Absence*

As discussed, Geng initiated a short-term disability leave on Monday, October 1, 2012.  PNC approved this leave of absence for a period of October 1, 2012 through October 21, 2012, as she requested.  When Geng notified Fuller that she was very sick and would be out on short-term disability leave, Fuller was nice to her and said, "Okay.  Hopefully you get better."  It is undisputed that no one at PNC told Geng that she could not or should not take a leave of absence.  Geng received short-term disability pay throughout the entire leave.  Geng felt well enough to work on October 22, 2012, without any accommodations or restrictions.  After returning to work, Geng made no additional requests for medical leave.

      E.     *Geng's Return from Medical Leave and Subsequent Policy Issues*

When Geng returned from medical leave on October 22, Bursac assigned her to work as a "floater" or floating Teller at different branches, as needed.  Bursac decided to assign Geng to work at different branches because Bursac needed teller support at other branches and because she wanted to give Geng an opportunity to work alongside other Teller Supervisors.  She also considered the fact that other tellers at the Lambertville Branch, particularly Reese, expressed concerns about working with Geng due to her viewing Reese's personal banking account.  Geng experienced no change in salary or title at this time, and Fuller remained her manager.

On or about November 1 and 2, 2012, when Geng was assigned to fill-in at the Hopewell, New Jersey branch office, Geng walked away from her teller station without locking her cash drawers or computer, and the amount of cash in her top drawer was over the limit allowed.  The Teller Supervisor at that branch saw Geng step away, and reprimanded her.  Because Fuller was still

Geng's supervisor, he had the obligation of delivering any written warning from this violation to her.

After discussing Geng's performance issues to date with Bursac, Bursac instructed Fuller to follow-up with Fornarotto to determine the next step of corrective action for the procedural violations at the Hopewell Branch, as well as for the check-violations that Geng had committed before she took medical leave. Accordingly, on November 7, 2012, Fuller reached out to Fornarotto for guidance on the perceived performance issues of Geng, and sought to place Geng on a written warning for each issue. Fornarotto replied to Fuller's email on November 7, and advised that he could go forward with a written warning for Geng's continued failure to lock her cash drawers before stepping away from her teller station.

On November 8, 2012, Fuller met with Geng and delivered the written warning to her for the incident at the Hopewell Branch. Geng signed the warning acknowledging receipt of the warning. While Geng does not dispute that she violated the PNC policy by leaving her teller drawer and computer unlocked, she asserts that she only stepped away for a few minutes because she had to take an emergency cell phone call. At this meeting, Fuller also delivered the final written warning that Brodsky had prepared for the September 24 Code of Ethics Violation. Fuller also advised Geng that she had committed several check-cashing violations at the Lambertville Branch before she took her leave of absence. Fuller showed Geng several checks that she had cashed, and she admitted to him that she should not have cashed one of the checks because it was made payable to a business, but she did not otherwise think anything she did was wrong in cashing or coding the other checks. Geng claims that during this meeting, and after receiving the two written warnings, she told Fuller, "I feel like you just want to get rid of me because you don't like me." Geng Dep. at 108. She also claims she told him, "You can't wait to get rid of me because I'm Chinese and, you know, I'm [an] old lady." *Id.*

After this meeting, Geng called Bursac to discuss the check-cashing violations and the incident in which she left her teller drawer unlocked at the Hopewell Branch. It is disputed whether Bursac told Geng that she should either step down from her Teller Supervisor role or she would be terminated, or if Bursac simply discussed the possibility of Geng stepping down from her role as Teller Supervisor because of her struggles in the position. Geng testified that she considered stepping down, but asked Bursac how her salary would be affected.

   F. *PNC's Investigation of Geng's Check-Cashing Violations and Termination*

On October 4, 2012, Fornarotto and Fuller discussed and reviewed the alleged check-cashing violations. Before Fornarotto realized the scope of the violations, she did not think that the violations deserved more than a verbal warning for her overall performance because she thought Geng had not committed check cashing violations but was just being careless. Thereafter, Fuller and Fornarotto exchanged several emails to determine the scope of the violations. Eventually, it was discovered that seven of the potential violations were careless mistakes where Geng had listed the check-cashing individuals as "non-customers" when the seven individuals were, in fact, PNC customers. The remaining potential violations included cashing two checks for non-customers without obtaining proper identification, cashing a business check, and cashing a check in excess of $1,000 against a customer's account that was overdrawn by over $300 and in the process of being charged off.

By November 16, 2012, Fornarotto and Fuller completed their review of the check-cashing violations by Geng and determined that Geng had cashed four checks with a collective value of $5,041.64 in violation of PNC's check-cashing policy. Because of the excessive amount and given her role as a Teller Supervisor, both Fornarotto and Fuller agreed that Geng's employment be terminated. On November 20, 2012, after speaking to her manager, Fornarotto emailed Fuller to confirm that the Employee Relations Management supported termination of Geng's employment for

her four cash-checking violations.  Fuller agreed with this recommendation.  Bursac, in her role as Regional Manager, was aware of this investigation and supported the decision to terminate Geng's employment.  Bursac also felt that Geng's policy violation was the final straw in a series of policy and procedure violations by Geng that warranted termination.

On November 23, 2012, Geng called the ERIC hotline for the first time to report that she felt like Fuller, her manager, was creating a hostile work environment for her.  Geng spoke to ERIC consultant Brandy Ruffner ("Ruffner"), who advised Geng to discuss her concerns with Bursac, her regional manager.  Ruffner further advised Geng to call ERIC again if her concerns were not resolved.

After Geng returned from vacation on November 26, 2012, Bursac met with her and advised her of the termination of her employment, effective that day, for cashing checks in violation of PNC policy.  Geng admits she violated PNC's Check-Cashing Guidelines for cashing a $1,320 check made payable to a business.  It is undisputed that Geng has no evidence to dispute that she violated PNC's Check-Cashing Guidelines by cashing the other three checks for which she was discharged.  It is also undisputed that there is no evidence of anyone at the Lambertville Branch cashing a check made payable to a business in violation of the Check-Cashing Guidelines, or of anyone who violated the Check-Cashing Guidelines in excess of $5,000 and not terminated as a result.  Seamon, who is Hispanic, was promoted to the position of Teller Supervisor at the Lambertville Branch.

On January 2, 2013, Plaintiff Geng filed this lawsuit, claiming that Defendants harassed and discriminated against her on the basis of her race, national origin, and age.  Plaintiff's discrimination claim appears to be based upon Fuller's remark that the Chinese owner of a restaurant who closed its merchant services was "stupid," and that Plaintiff received differential treatment from Fuller during her time at Lambertville as compared to the younger, non-Asians with whom she worked.  Plaintiff also alleges that Fuller tolerated certain workplace "bullying" against

her, asked her to step down from her Teller Supervisor position, and spoke to her in a rude manner. Plaintiff also claims that Defendants retaliated against her for taking a medical leave of absence and complaining about the alleged discrimination.  Finally, Plaintiff also alleges that she was subject to a hostile work environment due to her age and/or race.

## II.  Standard of Review

Federal Rule of Civil Procedure 56(a) provides that "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The substantive law identifies which facts are material.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party.  *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial.  *Anderson*, 477 U.S. at 249.  While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250.  If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be no genuine issue of material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir.

1992) (quotation omitted).  If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment.  *Big Apple BMW v. BMW of N. Am.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

**III.    Discussion**

      A.    *Race and Age Discrimination Claims*

Ms. Geng alleges that Defendants discriminated against her on the basis of her race and age in violation of 42 U.S.C. § 1981 and the NJLAD in Counts I and IV of her Complaint.  Plaintiff's claim is based on the termination of her employment with PNC on November 26, 2012.  When addressing employment discrimination claims under § 1981 and the NJLAD, the Court applies the familiar burden-shifting framework articulated in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  *See Vulcan Pioneers of N.J. v. City of Newark*, 374 F. App'x 313, 318 (3d Cir. 2010) (applying the *McDonnell Douglas* framework to Section 1981 and NJLAD claims); *Monaco v. Am. Gen. Ass. Co.*, 359 F.3d 296, 300 (3d Cir. 2004) (explaining that a claim for age discrimination under the NJLAD is satisfied by "presenting indirect evidence of discrimination that satisfies the familiar three-step burden shifting framework identified in *McDonnell Douglas*).

Under this framework, a plaintiff must first establish a prima facie case of discrimination by demonstrating that: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action was under circumstances giving rise to an inference of discrimination.  *See Shahin v. Delaware*, 543 F. App'x 132, 136 (3d Cir. 2013) (citing *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 797 (3d Cir. 2003)).

If a plaintiff successfully establishes a prima facie case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'"  *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (quoting *McDonnell Douglas*, 411 U.S. at 802)).  If the defendant meets this burden, then the plaintiff must then establish, by a

preponderance of the evidence, that these legitimate reasons were actually a pretext for discrimination. *Id.*

              1.    <u>Plaintiff's Prima Facie Case</u>

       Plaintiff has established a prima facie case of race and/or national origin discrimination. The first three prongs of Plaintiff's prima facie case are undisputed.  The only real issue of contention relates to the fourth prong; that is, whether Plaintiff's termination raises an inference of discriminatory animus.  "The central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Sarullo*, 352 F.3d at 798 (quotation and citation omitted).  When considering this prong, the exact nature of what is required to be shown by the plaintiff "depends on the circumstances of the case." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (quotation omitted).  Plaintiff has supplied evidence that she was replaced by Ms. Seamon, who is Hispanic and therefore outside of Plaintiff's protected class.  On the other hand, Ms. Seamon already worked at the Lambertville Branch.  It is entirely logical and consistent with lawful employment practices for Defendants to have turned to Ms. Seamon to assume Plaintiff's duties as a Teller Supervisor.  Considering, however, that the prima facie requirement "'is not onerous' and poses 'a burden easily met,'" *id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)), the Court finds that Plaintiff has met her burden of establishing a prima facie case of race and/or national origin discrimination.

       On the other hand, the Court finds that Plaintiff has failed to establish by a preponderance of the evidence a prima facie case of age discrimination because Plaintiff has not established that Plaintiff's termination raises an inference of age discrimination.  Plaintiff argues that she was replaced by someone who was "roughly 20 years younger" than she, but has admitted she does not know the age of Ms. Seamon.  Rather, Plaintiff has submitted an affidavit in which she speculates

that Ms. Seamon "appeared" to be close in age to Fuller, who is in his early 30s.  All that is established by the record, therefore, is that Plaintiff was one of the oldest people working in the Lambertville Branch, *see* Fuller Dep. at 77, and that Plaintiff herself guesses that her replacement was younger than her based upon her appearance.  While Plaintiff does not need to produce compelling evidence that the decision to terminate her resulted from age discrimination, she does need to point to a "sufficient age difference between [herself] and [her] replacement, such that a fact-finder can reasonably conclude that the employment decision was made on the basis of age." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995).  Plaintiff has failed to point to any such age difference.  Accordingly, the Court finds that Plaintiff has failed to establish a prima facie case of age discrimination under NJLAD.[4]

### 2.    Defendants' Proffered Non-Discriminatory Basis for the Termination

Because Plaintiff has established a prima facie case for race discrimination, the burden has shifted to Defendants to offer a non-discriminatory explanation for the decision to terminate Plaintiff.  *See Sarullo*, 352 F.3d at 799.  Here, the record establishes that the decision to terminate Plaintiff was based ultimately on her violation of PNC's Check-Cashing Guidelines in excess of $5,000.  This decision was made and supported by Fuller, Bursac, and the Employee Relations Management at PNC.  *See* Bursac Dep. at 94.  The decision was not, however, made in a vacuum; Bursac testified that Geng's check-cashing violations were the "final straw" in a series of policy and procedural violations by Geng that warranted termination.  *See* Bursac Dep. at 75.  Accordingly, Defendants have met their burden for establishing a legitimate, non-discriminatory reason for terminating Plaintiff.

---

[4] As discussed below, even if Plaintiff had established a prima facie case for age discrimination, her claim still would fail because she failed to demonstrate that Defendants' non-discriminatory and legitimate basis for terminating Plaintiff were pretextual.

3.     Plaintiff's Pretextual Argument

Plaintiff now has the burden of showing evidence that tends to indicate that Defendants'

proffered nondiscriminatory reasons are, in actuality, a pretext for invidious age or race

discrimination.  There are two ways in which a plaintiff may demonstrate pretext at the summary

judgment stage.  "First, the plaintiff may point to evidence in the record that would cause a

reasonable juror to disbelieve the employer's articulated legitimate non-discriminatory reason,

thereby creating a genuine dispute of material fact as to the credibility of that reason." *Burton v.

Teleflex Inc.*, 707 F.3d 417, 430 (3d Cir. 2013).  To do so, Plaintiff "must demonstrate such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendants']

proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them

'unworthy of credence.'" *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 310 (3d Cir.

2012) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)) (quotation marks omitted).  If

Plaintiff successfully provides such evidence, then she need not offer any other evidence of

discrimination beyond her prima facie case to defeat summary judgment.  *Burton*, 707 F.3d at 430.

Alternatively, Plaintiff may survive summary judgment "by pointing to evidence that indicates that

[Defendants] acted with discriminatory animus."  *Id.*

Here, Plaintiff has failed to point to or otherwise demonstrate that any evidence in the record

that could even possibly cast doubt on Defendants' articulated reasons for her termination, thereby

warranting summary judgment.  *See Fuentes*, 32 F.3d at 765.  Even considering Plaintiff's argument

that Fuller was somehow targeting her because of her age or race, Plaintiff admitted that she

violated PNC's Cash-Checking Guidelines in cashing a $1,320 check made payable to a business,

and has provided no evidence to dispute that she violated the Check-Cashing Guidelines by cashing

checks for non-customers without obtaining proper identification, or cashing a check for a customer

whose account was overdrawn and being closed.  These violations totaled over $5,000.  Plaintiff

argues that Fuller targeted her by researching other check cashing violations when he was only alerted to a single violation.  Plaintiff, however, has failed to show how this shows any sort of discriminatory intent on Fuller's behalf; rather, Fuller made a reasonable and legitimate business decision to investigate to see if there were any other check cashing violations committed by Plaintiff before he spoke to her in order to fully address the issue at once.   Plaintiff also argues that Fuller pushed Employee Relations to terminate her, despite the fact that they had only wanted to give her a verbal warning.  The record, however, does not support this assertion.  While it is true that Employee Relations Specialist Fornarotto did not initially recommend termination, once she understood the extent of the problem and the amount of checks at issue, she and Employee Relations Management actively supported termination for the check cashing violations.  Where others not accused of discrimination support an employee's termination, it is difficult to see how such termination could be the result of discrimination.  *See Mitchell v. UBS Servs. USA LLC*, CIV.A.07-1651, 2009 WL 1856630, at *12 (D.N.J. June 26, 2009).

Furthermore, even accepting Plaintiff's unsupported version of the underlying events, there is nothing in the record from which a reasonable juror could infer that the way Plaintiff was treated had anything to do with her race, nationality, or age.  *See Fuentes*, 32 F.3d at 765.  First, Fuller's two comments about an Asian customer being "dumb" or "stupid" for cancelling her account with PNC does not evidence any racial animus.  Plaintiff's assertion that these statements demonstrated that Fuller thought Chinese people were "stupid" because they could not speak English is purely speculative and not supported by the record.  Furthermore, the overall racial diversity at the Lambertville Branch, as well as the fact that Geng was replaced by another racial minority, undercuts the inference of racial discrimination.  *See, e.g., Lewis v. Cablevision Sys. Corp.*, CIV NO. 08-2793, 2010 WL 1133872, at *8 (D.N.J. Mar. 22, 2010); *Glover-Daniels v. 1526 Lombard St. SNF Operations LLC,* 2:11-CV-5519, 2012 WL 2885935, at *11 (E.D. Pa. July 16, 2012).

16

Plaintiff argues that she was terminated, but other younger, non-Asian employees who violated certain policies and procedures at the Lambertville Branch were not.  Plaintiff, however, cannot point to any other employee that had violated the Check-Cashing Guidelines in excess of $5,000 and was not terminated.   The only other conduct that comes close are Plaintiff's allegations that two other tellers had deposited on separate occasions a large check for a customers without conducting a deposit verification.  The employees at issue here, however, were not similarly-situated to Plaintiff, as they were not Teller Supervisors.  Geng, as a much more experience Teller Supervisor, was held to a higher standard than a normal teller.  Further, the record establishes that depositing a check without conducting a deposit verification is not a violation of PNC's Check-Cashing Guidelines.[5]  Plaintiff's other assertions about how Fuller allegedly treated her, such as her claim that he was "rude" to her or when he asked other employees—but not Geng—for their availability for a Christmas party, are too tenuous to support a finding of pretext.  That Plaintiff may have experienced personality conflicts with Fuller that resulted in a less than ideal work environment is simply not actionable.

Overall, Plaintiff has admitted to committing the violations that led to her termination, although she seems to disagree with the penalty she suffered.   The Defendants, however, were free to exercise their business judgment and terminate Plaintiff based upon her violation of PNC's Check-Cashing Guidelines as long as it was not a discriminatory animus that motivated the decision.  *See Fuentes*, 32 F.3d at 765.   The record reflects that Plaintiff was terminated for exactly the reasons proffered by Defendants and not due to any racially or age motivated mistreatment. Defendants' motion for summary judgment on Plaintiff's race/national origin and age discrimination claims under § 1981 and the NJLAD will be granted.

---

[5] The transactions are also fundamentally different in that one involves accepting a deposit of money into a customer's account.  The violations that Geng committed involved cashing a check and handing that money to an individual who is not a customer of PNC without obtaining any identification from him or her, as required by the Cash-Checking Guidelines.

B.     *Hostile Work Environment Claims*

Plaintiff has also alleged brought a claim for hostile work environment under Title VII and the NJLAD.  In order to state a claim for hostile work environment under either statute, Plaintiff must show "(1) the employee suffered intentional discrimination because of [her protected class], (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the [employee], (4) the discrimination would detrimentally affect a reasonable person of [like circumstances], and (5) the existence of *respondeat superior* liability." *Andreoli v. Gates*, 482 F.3d 641, 643 (3d Cir. 2007) (quotation and citation omitted).  *See Buffa v. New Jersey State Dep't of Judiciary*, 56 F. App'x 571, 575 (3d Cir. 2003) ("The courts of New Jersey rely upon federal court decisions under Title VII in reviewing hostile work environment discrimination claims.").

Here, Plaintiff has failed to establish that the allegedly harassing conduct occurred *because of* her age and race, and therefore her claims for hostile work environment must fail.  Plaintiff argues a hostile work environment was established by the use of "racially derogatory remarks that Asian people are 'stupid' or 'dumb' because they don't speak English."  Pl.'s Opp. Br. at 40.  The record, however, reveals that Fuller had called an Asian customer "stupid" to Plaintiff for cancelling her account with PNC; these comments evidence no racial animus, and any argument to the contrary by Plaintiff is purely speculative.  Furthermore, there is absolutely no evidence on the record at all about any harassing conduct occurring towards Plaintiff due to her age.

Even if Plaintiff had established that the harassing conduct occurred because of her age or race/national origin, she failed to establish that such conduct was sufficiently severe or pervasive to create a hostile work environment.  In fact, most of the conduct that Plaintiff alleges evidences a hostile work environment are either not supported by the record or outright refuted by the record. *See* Pl.'s Opp. Br. at 40.  Even considering the facts in the light most favorable to Plaintiff, Plaintiff alleges that Fuller criticized her performance, issued her written warnings, had her performance

18

monitored for disciplinary infractions, undermined her authority, and had formal disciplinary

meetings with Plaintiff.  The majority of these incidences occurred on two occasions—September

27, 2012, and November 8, 2012—and therefore cannot be considered sufficiently severe or

pervasive.  These incidences also stemmed from violations of PNC's policies that Geng either

admitted to, or that were witnessed by Fuller and/or Bursac.  Plaintiff also argues that her younger,

non-Asian co-workers were treated more favorably, because they would not be written up for

certain violations of the policies and procedures.  Plaintiff, however, has not identified any co-

worker who violated the same policy and procedure that she violated and was not written up,

nevertheless any co-worker who was also a Teller Supervisor such as Geng.[6]   Plaintiff also states

that she was treated differently than her younger, non-Asian co-workers, because Fuller excluded

her from conversations and failed to ask her about her availability for a Christmas party.  Geng,

however, has not shown that such conduct occurred because of her race and/or age, or that it was so

severe and persuasive that the workplace conditions became "hostile and abusive."  *Buffa v. New

Jersey State Dep't of Judiciary*, 56 F. App'x 571, 575 (3d Cir. 2003).  *See Bray v. Schlumberger

Tech. Corp.*, CIV.A. 10-4428, 2012 WL 1941855, at *5 n.3 (D.N.J. May 29, 2012) (explaining that

the plaintiff's allegations that she was excluded from various meetings and decisions, was accused

of misconduct that she was not responsible for, and was denied access to her personnel file was

"race-neutral and therefore not probative of discrimination or sufficient to give rise to an inference

of discrimination").

        Overall, Plaintiff failed to demonstrate that she was subject to either race- or age-based

harassment that was sufficiently pervasive and severe to alter the conditions of her employment.

Plaintiff's allegations for a hostile work environment seem to stem from being subject to certain

---

[6] While the record does establish that other employees walked away from a teller station without locking the drawers
and were not always written up, Geng failed to identify any individual who walked away from a teller station after the
Lambertville Branch's audit in September 2012 without locking the drawers, like she did.

disciplinary proceedings, yet Plaintiff has admitted to a majority of these violations, even if she did not think punishment was warranted. Plaintiff also points to several isolated incidences of being treated differently, but such "isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir.2005) (citation omitted). Plaintiff speculates that her age or race was the basis for the way she was treated, but mere speculation is insufficient to defeat a summary judgment motion. Therefore, Defendants' motion for summary judgment on Plaintiff's hostile work environment claims is granted.

      C.     *Retaliation Claims*

In Counts I and III of her Complaint, Plaintiff alleges that she was retaliated against for her complaints of discrimination in violation of § 1981 and the NJLAD. To maintain a claim for employer retaliation under either the NJLAD or § 1981, Plaintiff must first establish a prima facie case for retaliation by showing that "(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Moran v. DaVita Inc.*, 441 F. App'x 942, 946–47 (3d Cir. 2011) (citing *Lawrence v. Nat'l Westminster Bank*, 98 F.3d 61, 71 (3d Cir.1996)). In Count II of her Complaint, Plaintiff has alleged a claim for retaliation under the FMLA. In order to establish a prima facie case for retaliation under the FMLA, Plaintiff must show (1) that she exercised her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave. *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508-09 (3d Cir. 2009).

Retaliation claims under § 1981, the NJLAD, and the FMLA are subject to the familiar *McDonnell Douglas* burden-shifting framework. Accordingly, once a prima facie case is established, the defendant has the burden of establishing a legitimate, non-retaliatory reason for its

actions.  Thereafter, the plaintiff must demonstrate that the proffered legitimate reason was merely a pretext for the underlying discriminatory motive.  *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989).  *See Parker v. Verizon Pennsylvania, Inc.*, 309 F. App'x 551, 555 (3d Cir. 2009) (applying the *McDonnell Douglas* framework to claims for retaliation under the FMLA).

       1.    <u>Prima Facie Case for Retaliation</u>

Plaintiff has failed to establish a prima facie case for retaliation under § 1981, the NJLAD, or FMLA because she has failed to show a causal link between her termination and the protected activities.  A plaintiff may establish a causal connection by circumstantial evidence such as temporal proximity, a pattern of antagonism, and pretext.  *Kachmar v. SunGuard Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997).  However, temporal proximity alone is insufficient to support a causal link between the protected activity and the adverse employment action.  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997).  If temporal proximity is absent, a plaintiff may show a pattern of intervening antagonism or retaliatory animus during the passage of time.  *Id.* at 503–04; *Kachmar*, 109 F.3d at 177.  "These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference."  *Kachmar*, 109 F.3d at 177.  For example, a plaintiff may prove causation if an employer gave inconsistent reasons for terminating her.  *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 289 (3d Cir. 2001).

Plaintiff argues that the temporal proximity between her complaints of discrimination and her termination establishes a causal connection.  However, nearly all of the corrective action that Plaintiff received was initiated or delivered before Geng voiced any complaints or took FMLA leave.  It is undisputed that Fuller became aware of Geng's performance issues as early as August 25, 2012, when she instructed Rice to exchange money with a customer after Rice had settled her drawer.  Fuller initiated progressive discipline for this conduct on August 31, 2012, and was eventually told to issue to Geng a written warning for this conduct.   While it is disputed whether

Geng received this August 25 Warning, the record clearly shows that such discipline was contemplated before Geng engaged in any protected conduct.  Further, Fuller reported Geng's Code of Ethics violation for wrongly viewing Reese's bank account to Employee Relations on September 24, and PNC initiated progressive discipline for this violation on September 28, 2012.  This all occurred before Geng's first complaint of discrimination or before she requested FMLA leave.  In fact, Geng first complained of discrimination on September 28 to Employee Relations Investigator Brodsky *after* she was informed that she would receive a Final Written Warning for her Code of Ethics violation.  Plaintiff's written warning for leaving her teller drawers unlocked on November 8, 2012 stemmed from the verbal warning she received on September 27, 2012.  Furthermore, while this written warning came from Fuller, it was witnessed by a Teller Supervisor at a different branch, who is not alleged to have any knowledge of Plaintiff's protected activity.

Significantly, Fuller discovered Geng's check-cashing violations on September 28, 2012, and contemplated progressive discipline against Geng that same day when he contacted the ERIC hotline.  Once again, this occurred before Geng complained or requested FMLA leave.  While Plaintiff was not terminated until November 26, 2012,[7] it is clear that PNC was investigating Plaintiff's check-cashing violations and contemplating discipline before she complained of discrimination.  It is established that where employers are "proceeding along lines previously contemplated, though not yet definitive determined," causality is not established.  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001); *see also Rene v. Lidestri Foods, Inc.*, CIV. 09-3908, 2010 WL 4807050, at *9–10 (D.N.J. Nov. 17, 2010) (finding no causality where employer had already suggested to terminate the plaintiff before the employer had notice of the protected activity).

---

[7] Plaintiff also emphasizes that she was fired only three days after her most recent complaint, on November 23, 2012. However, the Employee Relations Management had informed Fornarotto and Fuller that they supported the termination of Plaintiff on November 20, 2012.

Plaintiff also alleges that an inference of retaliation can be drawn from the "antagonism" Plaintiff faced after her protected conduct.  Plaintiff, however, has failed to show any antagonist behavior that began after her complaints of discrimination or FMLA leave.  *See Walters v. Carson*, 2013 WL 6734257, at *6 (D.N.J. Dec. 19, 2013) (explaining that it is "incumbent upon the employee to demonstrate that the antagonistic behavior began" after the employee engaged in protected conduct); *see also Abramson*, 260 F.3d at 289 (finding causality was established when plaintiff showed evidence of "ongoing antagonism" after employee complained of discrimination). Rather, the conduct that Plaintiff argues shows a period of "intervening antagonism" is not markedly different from the conduct that Plaintiff alleges occurred before she made engaged in protected conduct or request FMLA leave.  *See Randler v. Kountry Kraft Kitchens*, Civ. No. 1:11-CV-0474, 2012 WL 6561510 (M.D. Pa. Dec. 17, 2012) (explaining that employee failed to show "intervening antagonism" when the conduct she described was no different from the incidents she experienced prior to her protected conduct).  For example, Plaintiff points to how she was assigned to be a floater when she returned from medical leave.  Plaintiff, however, had been assigned to "float," or work at different branches when necessary, on several occasions before any of her alleged protected activity.  Plaintiff also argues that Fuller ignored her, and that she was asked to step down as a Teller Supervisor.  Plaintiff, however, has stated that similar conduct happened before she engaged in any sort of protected activity.  Finally, Plaintiff has tried to establish that she was subjected to antagonism based upon the two written warnings she was given when she returned from her medical leave.  Before Plaintiff engaged in protected activity or requested her FMLA leave, she was advised that she would be given a final written warning for her ethics violation. Likewise, Plaintiff had been counseled and issued a verbal warning about leaving her drawers unlocked in violation of PNC policy before she engaged in protected activity.  Indeed, the record is devoid of any intervening antagonism by Defendants that would allow for an inference that

Plaintiff's complaints or FMLA leave led to her termination.  *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (finding that the record did not establish antagonism sufficient to create an inference of retaliation where none of the events after employee's complaint showed "a qualitatively different relationship" between employee and employer).

Finally, Plaintiff has not identified any evidence showing inconsistencies in Defendants' reason for terminating her employment.  Having failed to point to any evidence in the record that may establish a causal link between either Plaintiff's protected activity or her FMLA leave and her termination, Plaintiff has failed to establish a prima facie case for retaliation.

2.      Plaintiff's Pretextual Argument

Even if Plaintiff had established her prima facie case for retaliation, Plaintiff has failed to establish that she was terminated for pretextual reasons.  Plaintiff points to the same pretextual arguments that she has made in regards to her discrimination claims.  Therefore, for the reasons discussed above, Plaintiff has failed to show that the proferred legitimate reason for Plaintiff's termination was "unworthy of credence," or that discrimination was more likely than not a motivating or determinative cause of Defendants' decision to terminate Plaintiff.  *See Fuentes*, 32 F.3d at 765.  Rather, even when viewed in a light most favorable to Plaintiff, the record clearly indicates that she would have been terminated for her violation of the Check-Cashing Guidelines, regardless of her complaints of discrimination or decision to take FMLA.  While there may have been a tense relationship between Plaintiff and Fuller, the record clearly establishes that Plaintiff was performing problematically at work, breaking several of PNC's policies.  As termed by Bursac, the "final straw" was Plaintiff's violation of the Check-Cashing Guidelines—violations which, in themselves, were sufficient for termination.  Accordingly, because a rational trier of fact could not find in Geng's favor, summary judgment in favor of Defendants must also be granted on Plaintiff's retaliation claims under § 1981, the NJLAD, and the FMLA.

D.   *Claim for Interference under the FMLA*

Finally, Plaintiff has brought a claim for unlawful interference under the FMLA in Count II of her Complaint.  "In order to assert a claim of interference, an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits."  *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007) (citing *Callison v. City of Philadelphia,* 430 F.3d 117, 119 (3d Cir.2005)).  A claim for interference under the FMLA is "not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA."  *Callison*, 430 F.3d at 120. Accordingly, an employer cannot justify its actions by establishing a legitimate business purpose for its decision.  *See id.*; *Sommer v. The Vanguard Group*, 461 F.3d 397, 400 (3d Cir. 2006) (explaining that the *McDonnell Douglas* framework does not apply to FMLA interference claims).

Here, Plaintiff's interference claim fails for the very basic reason that she was not denied any leave that she requested.  *See Callison*, 430 F.3d at 119.  Rather, she admits that PNC granted her all the leave that she requested, and that she had no further need for medical leave once she returned to work.  Plaintiff asked for and received a three-week paid medical leave, and was never told that she could not or should not take medical leave, or otherwise discouraged from taking leave.  Plaintiff argues that she was reassigned as a floater upon her return from leave, and that this could have interfered with her FMLA rights.  There is no precedence for the claim that reassignment could constitute an interference with an individual's FMLA rights, nor does it solve the very basic problem that the record is completely devoid of any evidence that Plaintiff was ever discouraged or prevented from taking leave.  *Cf. Shtab v. Greate Bay Hotel & Casino, Inc.*, 173 F. Supp. 2d 255, 267-68 (D.N.J. 2001) (explaining that an employer's request for plaintiff to delay his FMLA leave could allow a reasonable person to conclude that plaintiff's assertion of his rights under the FMLA were "chilled"); *Williams v. Shenango, Inc.*, 986 F. Supp. 309, 320-21 (W.D. Pa.

1997) (denying motion for summary judgment where the employer denied the request for FMLA leave and then suggested rescheduling "may have 'chilled' or otherwise discouraged [the plaintiff's] assertion of FMLA rights").  Accordingly, summary judgment must be entered in favor of Defendants on Plaintiff's FMLA interference claim.

**IV.     Conclusion**

     For the reasons stated above, Defendants' motion for summary judgment is granted, and judgment will be entered in favor of the Defendants.  An appropriate Order accompanies this Opinion.

                  /s/ Joel A. Pisano          
                  JOEL A. PISANO, U.S.D.J.

Dated: July 31, 2014